Leyla B. DE ANDA, Plaintiff-Appellant,

v.

ST. JOSEPH HOSPITAL,
Defendant-Appellee.

No. 80–1639
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 3, 1982.

David T. Lopez, Houston, Tex., for plaintiff-appellant.

Fulbright & Jaworski, A. J. Harper, II, Susan J. Piller, Houston, Tex., for defendant-appellee.

Before CLARK, Chief Judge, REAVLEY and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This appeal is taken from a decision of the district court in favor of St. Joseph Hospital ("St. Joseph"), Defendant-Appellee, in an action brought under Title VII of the Civil Rights Act of 1964 and § 1981 of the Civil Rights Act of 1866 by Plaintiff-Appellant, Leyla De Anda ("De Anda"), a pharmacist formerly employed by St. Joseph. De Anda sued, claiming that because she had complained to hospital administrators of alleged racial discrimination in hiring practices of the director of pharmacy, Scotty Slater ("Slater"), she had subsequently been harassed by unwarranted counseling reports and ultimately discharged in retaliation for her protests initially to St. Joseph and ultimately to EEOC.[1] She also sought declaratory and

---

1. "Retaliation" is a term coined to describe actions taken against an employee by an employer because the employee has opposed allegedly discriminatory practices by the employer or participated in a proceeding, charge or hearing where such practices are challenged.

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment prac-

injunctive relief against alleged racially discriminatory practices of St. Joseph.

The trial court, after hearing evidence, held that De Anda failed to establish a prima facie case of retaliation, that even if a prima facie case had been established, St. Joseph had articulated legitimate, non-discriminatory reasons for its counseling reports and termination that were not motivated by De Anda's actions protesting alleged discrimination.

The court further held that it lacked jurisdiction over De Anda's § 1981 claims and that even if the court had jurisdiction under § 1981, De Anda had failed to establish a prima facie case of retaliation under § 1981.

On appeal, De Anda asks us to reverse the trial court's findings of no retaliation and lack of jurisdiction under § 1981. We hold that the case must be remanded to the trial court for further findings of fact and conclusions of law as to the Title VII claim. Further, we vacate the trial court's judgment that it had no jurisdiction under § 1981 and remand that claim for supplemental briefing, findings of fact and conclusions of law.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Leyla De Anda, after receiving a degree in pharmacy, was employed as a technician in the pharmacy department at St. Joseph in February, 1970 filling prescriptions. In 1972, after passing the pharmacy registry, De Anda became a staff pharmacist in the intravenous ("IV") room of the pharmacy. As a staff pharmacist, De Anda filled IV mixtures to be given to the patients in St. Joseph. In April, 1976 De Anda was promoted to supervisor of the 7 a. m. to 3:30 p. m. shift in the IV room of the pharmacy department. At the same time De Anda was appointed supervisor for the IV room on one shift, supervisors were appointed in

the main dispensary and the IV room for other shifts. During the first seven-and-one-half years of her employment (until November, 1977), De Anda received good to outstanding evaluations and as late as May, 1977 was considered a potential assistant director of the pharmacy department. Until that date she had no written reports in her file detailing any problems in her positions as staff pharmacist and supervisor.

In January, 1977 the hospital hired Slater as director of the pharmacy department. At the time of Slater's hiring, the hospital was concerned about possible racial tensions in the pharmacy department, medication errors, financial problems and lack of accountability for drugs.

In May, 1977 contemporaneous with De Anda's evaluation indicating potential for promotion to assistant pharmacy director, Slater and Steve Eckerd, then assistant director of pharmacy, told De Anda that she had twenty-four hour responsibility for the IV room. This twenty-four hour responsibility was acknowledged by De Anda, though she maintained it had been pushed upon her without appropriate compensation or promotion.

In September, 1977 the hospital hired John Glorioso ("Glorioso") as an associate director of pharmacy. He was in charge of the operational aspects of the pharmacy department, including the IV room. Glorioso was the "number-two" person in the department and reported directly to Slater. De Anda, as a supervisor in the IV room, reported directly to Glorioso.

In September, 1977 Slater gave De Anda authority to hire a staff pharmacist for the IV room during his absence from the hospital. De Anda apparently reviewed several applications and discussed the potential hiring with Slater. According to De Anda, Slater told her to pay different

tice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e–3(a) (1976). These protected activities are described as "opposition" or

"participation" activities. In the case before us, De Anda both opposed allegedly illegal practices and participated in the filing of a charge before the EEOC. Thus any differences in treatment as to these two types of claims are irrelevant to our decision.

wages to a black potential pharmacist than would be paid to a white potential pharmacist. De Anda, sometime in late September, reported what she perceived as racial discrimination in hiring to the hospital administration.[2]

Subsequent to De Anda's report of Slater's alleged racial discrimination, she received verbal and written counseling pertaining to alleged errors in her job performance and in the performance of pharmacists on other shifts because of her 24-hour supervisory responsibility.[3] The written reports followed closely after complaints were made by De Anda initially to the hospital concerning Slater's racial discrimination in hiring and subsequently to the EEOC concerning his alleged harassment of De Anda in retaliation for her earlier complaints.[4]

2. De Anda need not prove that the discriminatory hiring practices alleged in her complaint in fact, existed. She need only prove that she had a "reasonable belief" that such practices existed in order to be protected by Title VII of the Civil Rights Act of 1964. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 (5th Cir. 1981). There was conflicting testimony whether Slater told De Anda to pay less to a black pharmacist than a white. The trial court made no specific finding on this issue nor was the question of a reasonable belief by De Anda challenged by St. Joseph on appeal. While St. Joseph does maintain that Slater did not discriminate, it does not specifically challenge De Anda's complaint as being based on an unreasonable belief. We therefore find, as a preliminary matter, that we need not in our decision address the question whether Slater practiced racially discriminatory hiring policies with respect to wages paid. That is not to say that, on remand, such a determination by the trial court will not be necessary in the context of its findings on De Anda's § 1981 claim. *See* Part III, *infra*.

3. We note that although Slater maintained that transcription errors averaged seventeen per month when he arrived in January, he never counseled De Anda about errors made by other shifts until after her report, though she allegedly had 24-hour responsibility. Additionally, other employees, including shift supervisors, were not informed that De Anda had any such responsibility.

4. It seems worthwhile to set forth the sequence of written and oral accusations, complaints, reports and memoranda after September 1977 and Ms. De Anda's discharge in November, 1977. The record does not reflect precise dates in some cases. In others, while precise dates on which a report was written are given, the dates of receipt by De Anda or hospital officials are unclear.

September 1977—alleged incident of racial discrimination in hiring by Slater occurs;

September 1977—Glorioso hired as associate director of pharmacy;

Late September or early October, 1977—De Anda complained to John Single, Personnel Department about Slater's alleged racial discrimination in hiring;

October 11, 1977—Memorandum from plaintiff "To Whom It May Concern" complaining of harassment, racism and sexism by Slater, delivered to Mr. John Single;

October 13, 1977—Memorandum by De Anda setting forth allegations of harassment and reprimands by Slater occurring during the past month (never delivered to any hospital or EEOC official);

Late October, 1977—Meeting among De Anda, Slater and other hospital officials regarding De Anda's charges of harassment;

November 1, 1977—Memorandum from De Anda to Slater complaining of Slater's alleged harassment, discrimination;

November 1, 1977—Memorandum to the file by Glorioso detailing verbal counseling to De Anda because of failure to adequately train and orient employees to proper hospital policy and procedure.

November 6, 1977—Letter from De Anda to Christopher Charney, Associate Administrator—Operations, setting forth prior sequence of events leading to, and complaints regarding Slater's harassment and stating that "I have gone outside the Hospital to file a complaint with the EEOC," Pl. Exb. 5, p. 2.

November 7, 1977—Written counseling report from Glorioso to De Anda detailing a medication transcription error made by employee on another shift and detailing a more widespread breakdown in correct medication dispensing policy. See n. 3, *supra*.

November 10, 1977—Written report by Slater detailing audit by Slater of medication records in the IV room which indicated continuance of the transcription problem noted in the November 1, 1977 report.

November 14, 1977—Written report from Glorioso relating to correction of prior transcription errors.

November 14, 1977—Written report by Slater detailing an admitted request by De Anda to a nurse at St. Joseph's to refrain from reporting a medication error by another pharmacist.

November 17, 1977—Written report by Glorioso regarding further transcription errors on another shift.

Ultimately, De Anda was terminated by Slater for an incident detailed in the written report of November 18, 1977. Briefly, the uncontroverted report of the incident showed that a nurse showed a syringe containing a brown substance to De Anda on November 13, 1977. The syringe contained a brown substance which had been withdrawn into the syringe from an IV tubing solution being administered to a patient. The nurse asked De Anda for her advice in determining the foreign substance from the IV tube. De Anda determined that the substance was probably a blood clot and returned the syringe to the nurse, telling her to show the syringe to her supervisor.[5] De Anda also prepared an identical IV to the one which had been given to the patient to replace the one containing the foreign substance. De Anda did not further investigate the matter until the next day, November 14, and never determined the source of the foreign substance.

Slater received a report of the "foreign substance" incident on November 15. On November 18, he prepared a written report detailing the incident, describing possible problems of incompatibility of two solutions which were being administered together in the IV and which might be indicated by the foreign substance, noting De Anda's failure to investigate this possible incompatibility, describing possible dangers to patients from her failure to investigate the cause of the foreign substance, and dismissing her "for failure to take reasonable action, based on your experience and professional knowledge to protect this and possibly more patients." Def. Exb. 1, p. 3.

> November 17, 1977—Written report from Glorioso relating to De Anda's failure to insure correct charging by the pharmacy department of IV's issued to patients.
> November 18, 1977—Written report and notice of termination by Slater resulting from De Anda's handling of a report by a nurse of a brown substance in an IV which was being administered to a patient.

5. De Anda maintained, and St. Joseph did not deny, that a blood clot in an IV would be a problem resulting from *how* the IV was administered, to be handled by the nursing staff, rather than a pharmacy problem resulting from *what* was administered.

The EEOC subsequently issued a "right to sue" letter and De Anda brought suit alleging racial discrimination and retaliation against her by St. Joseph in violation of of Title VII, 42 U.S.C. § 2000e-3(a) (1976), and § 1981, 42 U.S.C. § 1981 (1976). At trial, several witnesses testified that Slater treated blacks different than whites, that several black employees had left the hospital after his employment, and that the overall number of blacks in the pharmacy department had decreased. Additionally, there was testimony that one pharmacist had told another that De Anda would be and was fired because of her "embarrassing" complaints against Slater, and that at least one person, Willis Jackson, a former employee, noticed Slater treating De Anda differently before the complaints than he did after her complaints.

The testimony presented by St. Joseph included a denial by Slater of De Anda's charge of discrimination, an explanation by Slater and Glorioso of the various counseling reports and specifically an explanation of the reasons that they determined De Anda had acted in a manner which could have placed patients' lives in jeopardy.

De Anda did not introduce any experts to testify about her reaction to the "foreign substance" incident, nor did St. Joseph. De Anda introduced written evidence that the solutions being given in the troublesome IV were, in fact, compatible and St. Joseph introduced evidence that the solutions could be incompatible.[6]

After reviewing the sequence of events described above and the testimony relevant

6. We do not feel it is within our realm of expertise, nor is it our duty, to determine if incompatibility existed. St. Joseph maintained that De Anda should have checked for incompatibility and that her failure to do so was the reason for her termination; not whether there was, in fact, an incompatibility. Whether St. Joseph was wrong in its determination that she should have checked is irrelevant, as long as its belief, though erroneous, was the basis for the termination. *Jefferies v. Harris County Community Action Center*, 615 F.2d 1025, 1032.

to them, the trial court found no actionable retaliation by St. Joseph against De Anda and no jurisdiction to decide the § 1981 claim. De Anda appeals, claiming that the trial court erred in its determination that no retaliation existed because it failed to complete the legal analysis required in a Title VII case, *i.e.*, to consider whether St. Joseph's articulated reasons for De Anda's discharge were pretextual. De Anda also appeals the court's determination that it did not have jurisdiction under § 1981. We address each argument in turn.

## II. THE TITLE VII CLAIM OF RETALIATION

### A. *The Standard of Review*

■■■ We first note that our standard of review of the findings of fact of the trial court in this Title VII case is dependent upon whether the finding at issue is one of ultimate fact or subsidiary fact. *Wilkins v. University of Houston*, 654 F.2d 388 at 389–90 (5th Cir. 1981). In a Title VII case, the ultimate finding of fact, whether there was unlawful discrimination, is subject to independent review by this court. *Wilkins*, 654 F.2d 388 at 389–90; *Gupta v. East Texas State University*, 654 F.2d 411, 414 (5th Cir. 1981); *Rhode v. K. O. Steel Castings, Inc.*, 649 F.2d 317 (5th Cir. 1981); *Danner v. United States Civil Service Commission*, 635 F.2d 427 (5th Cir. 1981); *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025, 1031, n. 5 (5th Cir. 1980). In doing so however, this court is bound by the trial court's findings of subsidiary fact that are not clearly erroneous. *Wilkins*, 654

F.2d at 390. This twofold review thus mandates that "the reviewing court ... determine whether there are enough 'subsidiary facts' to undergird the ultimate fact." *Jefferies*, 615 F.2d at 1031, n. 5 (citation omitted). If sufficient factual findings exist, the court must review the factual findings under the clearly erroneous standard in order to then be in a position to independently review the ultimate finding as to whether discrimination exists. If the factual findings are absent, the case must be remanded for such findings, *Jefferies*, 615 F.2d at 1031. Additionally, an independent review of the trial court's decision must be undertaken if we determine that the findings were made "under an erroneous view of controlling legal principles."[7] *Parson v. Kaiser Aluminum & Chemical Corp.*, 575 F.2d 1374 (5th Cir. 1978), *cert. denied*, 441 U.S. 968, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979).

In summary, assuming the trial court has applied correct controlling legal principles to its findings of fact, in a Title VII case, the reviewing court must

(1) determine if there are sufficient findings of subsidiary facts upon which a review may be made;

(2) review those findings of subsidiary facts under the Fed.R. of Civ.P. 52(a) "clearly erroneous" standard; and

(3) independently determine whether those subsidiary facts which are not clearly erroneous support the finding of ultimate fact controlling the trial court's decision.[8]

---

**7.** Such an error might occur if the trial court required that the burden of proof rather than of production of evidence shift to the defendant after the plaintiff had established a prima facie case of discrimination, contrary to the directions of *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**8.** We note that there are seemingly unanswered questions about what is a "subsidiary fact" and what is an "ultimate fact" in a Title VII case. *See, e.g., Bickel v. Burkhart*, 632 F.2d 1251, 1255 n. 5 (5th Cir. 1980) (where the court comments that "[t]here is some uncertainty as to the proper scope of appellate review of a trial court's resolution of ... [the] causation

issue [in a retaliation case]," citing *Van Ooteghem v. Gray*, 628 F.2d 488, 491 (5th Cir. 1980)). Whether other questions of fact are subject to the clearly erroneous standard is also uncertain. *See, Merriweather v. Hercules*, 631 F.2d 1161 (5th Cir. 1980) (holding that pretext is subject to the clearly erroneous standard). *Compare, Ramirez v. Sloss*, 615 F.2d 163 (5th Cir. 1980) (holding that a prima facie case is subject to independent review).

Additionally, there is a split in the circuits whether a distinction is to be made between subsidiary facts and ultimate facts, as is done in this circuit, or whether all factual findings are to be reviewed under the clearly erroneous standard. *Kunda v. Muhlenberg College*, 621

### B. *De Anda's Title VII Claim*

■ Our review of De Anda's claim of St. Joseph's violation of Title VII,[9] based on Slater's alleged rataliation in the form of harassment and ultimate termination, is guided by the standards set forth by the United States Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and clarified in *Burdine v. Texas Department of Community Affairs*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Dickerson v. Metropolitan Dade County*, 659 F.2d 574 (5th Cir. 1981); *Gupta v. East Texas State University*, 654 F.2d 411 (5th Cir. 1981); *Payne v. McLemore's Wholesale and Retail Stores*, 654 F.2d 1130 (5th Cir. 1981); *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980). In demonstrating her contentions, De Anda had the initial burden of establishing a prima facie case of retaliatory conduct. The burden of production of evidence then shifted to St. Joseph to articulate some legitimate nondiscriminatory reason for the alleged retaliatory conduct. Finally, the burden again shifted to De Anda to demonstrate that the alleged nondiscriminatory basis for the action was merely a pretext for discrimination. *Dickerson*, 659 F.2d 574 at 580.

■ In order to conduct this review, we must be presented with sufficient subsidiary facts to determine if they do, indeed, undergird the trial court's final decision. *Jefferies*, 615 F.2d at 1031, n.5. Thus there must be sufficient findings of fact by the trial court in which the trial court reviewed the evidence introduced at trial in light of the unique requirements of a claim of retaliation. In such a case, the plaintiff must establish by a preponderance of the evidence (1) that he or she engaged in an activity protected by Title VII, (2) that an adverse employment action occurred; and (3) that there was a causal connection between the participation in protected activity and the adverse employment activity. *Dickerson*, 659 F.2d at 580–581. See generally, B. Schlei and P. Grossman, Employment. Discrimination Law 438–440 (1976).

■ A review of the trial court's findings of fact in the case before us show no findings [10] of subsidiary fact with respect to De

---

F.2d 532, 544 (3rd Cir. 1980) (even findings of ultimate fact are to be reviewed under the clearly erroneous standard).

9. See note 1, *supra*, for the statutory text of the applicable provision of Title VII.

10. The findings of fact are:

1. Plaintiff is a white female pharmacist who has been employed by Defendant, a private religious-affiliated hospital in Houston, Texas, since 1970.

2. In 1976 Plaintiff was promoted to a supervisory position in Defendant's Pharmacy Department. Plaintiff was responsible for supervision and administration of the "I.V." service, which included responsibility for directing and controlling subordinate employees in the preparation of I.V. solutions, coordination with the nursing staff regarding the administration of I.V.s, and the maintenance of proper control over the hospital's drugs used in the preparation of I.V.s.

3. After January, 1977, Plaintiff was told by Defendant's Pharmacy Director and Assistant Pharmacy Director that she had 24-hour responsibility for the I.V. service.

4. Prior to January, 1977, Defendant had experienced some difficulties with its Pharmacy Department regarding the loss of controlled drugs and in the deterioration of rela-

tions between the Pharmacy Department and Defendant's Nursing Staff. The complaints of the Nursing Staff included criticism of Plaintiff for alleged errors in the handling and preparation of I.V. solutions for patients and the lack of responsiveness of Plaintiff and her employees to problems with I.V. solutions. In January, 1977, Plaintiff employed a new Pharmacy Director for the specific purpose of solving the problems relating to the Pharmacy Department.

5. In September, 1977, Plaintiff was placed under the immediate supervision of the new Assistant Director of Pharmacy. The new Assistant Director verbally counselled Plaintiff on numerous occasions between September and November, 1977, regarding deficiencies in Plaintiff's performance as a supervisor. Plaintiff was specifically counselled regarding her inability to properly schedule employees for work shifts and her inability to prevent transcription and dispensing errors regarding the preparation and administration of I.V.s. On November 7, 1977, Plaintiff also received a written counselling report by the Assistant Director for her deficiencies regarding her failure to train and supervise her employees properly in hos-

Anda's allegations of protected activity and a causal link between that activity and the alleged adverse action. Because the court failed to even mention the plaintiff's opposition to, and reporting to St. Joseph of, Slater's alleged racial discrimination which she alleges is a substantial cause of her harassment and termination [11], we are unable to find that the court made sufficient findings of subsidiary fact to enable us to evaluate her claims according to the appropriate standards of review.[12]

---

pital procedures to avoid transcription and dispensing errors in the Pharmacy Department.

6. After the counselling described in paragraph 5, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission on November 7, 1977, and Defendant received a copy of this charge on November 9, 1977. After November 9, 1977, Plaintiff received additional written counselling reports for continuing failure to take action to prevent transcription and dispensing errors and requesting a Head Nurse not to report a dispensing error as required by Hospital policy.

7. Plaintiff was discharged as the result of an incident which took place on November 13, 1977. On the evening of November 13, 1977, while Plaintiff was on duty in the Pharmacy Department, a nurse brought Plaintiff an I.V. bottle which showed either an incompatibility of drugs or an impurity in drugs being administered to a patient. Even though this incompatibility or impurity was potentially dangerous, Plaintiff failed to investigate and determine the cause of the incompatibility or impurity prior to her leaving the hospital. Plaintiff further failed to contact any other supervisors and advise them of the problem that had developed on November 13, increasing the risk that additional patients could be injured if the cause of the problem with the I.V. on November 13 was an impure drug rather than an incompatibility between drugs being administered to the patient.

8. The actions of Defendant in counselling, suspending and discharging Plaintiff were for legitimate, nondiscriminatory reasons and were not motivated by any actions of Plaintiff protected by § 704 of Title VII or 42 U.S.C. 1981.

I–Rec 45–47.

11. We note again that De Anda need not have been correct in her complaint that Slater discriminated but need only establish that she had a reasonable belief that he did so. See n.2, supra.

12. Whether in establishing a prima facie case of retaliation, including that the employee was fired because of her activity (causation), the plaintiff must show the protected activity is the sole reason for the employer's action or only one of several reasons (some of which are legitimate) for the action is unclear from the law of this circuit. In the initial determination of a prima facie case, especially in light of the obli-

gation of the employer to rebut such a case by an articulation of a legitimate nondiscriminatory reason and the subsequent burden of plaintiff to prove pretext, it is possible plaintiff need not prove such participation was the sole factor in the employer's action, but need only introduce enough evidence, direct or indirect, to show a causal link, i.e., that without some explanation from the defendant it is more likely than not "that such actions were 'based on a discriminatory criterion illegal under the Act.' " Furnco Construction Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (citation omitted).

If, however, defendant challenges causation either by introducing evidence of no causal link or of other cause, the burden on the plaintiff to show causation to establish her case is that "but for" the protected activity no action would have taken place. See McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 282 n.10, 96 S.Ct. 2574, 2580 n.10, 49 L.Ed.2d 493 (1976).

Additionally, McDonnell-Douglas offers some possible methods of proof of pretext and describes what is meant by "pretext." McDonnell-Douglas, 411 U.S. at 804–05, 93 S.Ct. at 1825–1826. Pretext is further defined in McDonald v. Santa Fe Trail Transportation Company, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), as a "but for" standard; that is, the employee need not prove that her activity was the sole basis for the employer's action, but the employee must prove that "but for" the activity he or she would not have been fired. Jackson v. City of Killeen, 654 F.2d 1181, 1185, 1186 (5th Cir. 1981) (articulating the "but for" test for pretext); Pittman v. Hattiesburg Municipal Separate School District, 644 F.2d 1071, 1076 (5th Cir. 1981) ("(to show pretext, need only show race was a "but for" cause, not sole basis, for employment action); Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1977)"). See Sherkow v. State of Wisconsin Department of Public Safety, 630 F.2d 498 (7th Cir. 1980) (pretext to be determined according to "but for" standard). Cf., NLRB v. Wright Line, Inc., 662 F.2d 899 (1st Cir., 1981) (holding that the "but for" test applied in a "mixed motive" case under the National Labor Relations Act). Compare, Williams v. Boostin, 663 F.2d 109 (D.C.Cir.1980) (holding that in a mixed motive retaliation case the "but for" test applies to pretext but further holding that the burden shifts, after employee has shown pretext under the "but for" test, to the employer to

Moreover, we find that the court, while stating that there was no retaliatory motive, did so without articulation of its considered judgment as to all the facts relevant to the determination. While the court did mention De Anda's EEOC complaint, its failure to mention her protected opposition to, and reporting to St. Joseph of, Slater's alleged racial discrimination and its failure to analyze her complaint under the standards of *Dickerson, Smalley* and *Whatley* renders a review by this court impossible.

We do not intimate that the court reached an incorrect conclusion. Rather, we remand for additional findings of subsidiary facts so that we may determine if they support the conclusions of no discrimination.

## II. THE SECTION 1981 CLAIM

■ De Anda also brought her action for declaratory and injunctive relief and damages under § 1981.[13] The court in its conclusions of law, without fully articulating its reasoning or the basis for its decision, ruled that it did not have jurisdiction to hear De Anda's § 1981 claim "because § 1981 is limited to claims of discrimination based upon race and race-related factors. Section 1981 does not encompass claims of retaliation for filing a charge with the Equal Employment Opportunity Commission or opposing alleged unlawful employment practices." Our review of the record indicates that initial briefing by the parties to the trial court did not focus on the precise issues involved in consideration of De Anda's § 1981 claim nor did the trial court's conclusions of law articulate the factual and legal basis for its decision.

show that, absent retaliation, the plaintiff would have lost his job anyway). This analysis allows for the occurrence of mixed motive cases where some permissible and some impermissible motives exist, allowing the plaintiff to prove that the impermissible motive was a determinative, if not sole, factor in the adverse action.

**13.** Section 1981 states:
All persons within the jurisdiction of the United States shall have the same right in

We therefore instruct the trial court to order supplemental briefs to address the issues raised by De Anda's § 1981 claim and to reconsider, in the light of the briefing, its conclusions of law. We do not intimate that the trial court need change its ultimate conclusion. We only request that its conclusion be reached after full consideration and articulation of the appropriate legal and factual questions.

Each party shall bear its own costs.

VACATED and REMANDED with instructions.

every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981 (1976).